Good afternoon, I guess I can officially say good afternoon. I think you can. May it please the court, my name is Colin O'Brien and I'm here on behalf of Red Oil and other petitioners. I would like to reserve five minutes for rebuttal. Today I will address our two claims regarding the air permits that EPA issued authorizing air emissions from the Discoverer drill ship and its fleet of associated vessels. First, like any other major source of air pollution, emissions from the Discoverer's operations must be limited using the best available control technology. Here, EPA failed to require the use of such technology on the Discoverer's service and support vessels, which emit the overwhelming majority of the air pollution associated with Shell's operations. Mr. O'Brien, you say like any other source. As I read the statute, the BACT requirements apply to an OCS source, right? Correct. Is OCS source a defined term in the statute? Yes. Why do you say any other source? Are the moving supply vessels OCS sources? The support vessels are defined with respect to the OCS source. No, no, no. I didn't ask that. Perhaps I'll say it again. Is there any case that you can point me to that says supply vessels whose emissions should be counted with those of the OCS source, the Discoverer? Other than the one attached. The statute says that directly. It's within the definition of OCS source at 7627AC4 that support vessels are addressed. So it's within the definition of OCS source that the connection is made. Let's try it again. Let me see if I can concentrate your mind, or my mind, on this issue. Is there any place where anything other than a stationary OCS source is required to meet BACT standards? Within the Outer Continental Shelf, or you mean generally? Within the Outer Continental Shelf. That's where we are, right? Right. Well, the way that Section 328 works is it says that the requirements of the Prevention of Significant Deterioration Program will be applied to OCS sources. Well, to OCS sources. Now, are moving ships OCS sources within the meaning of the statute which applies BACT to OCS sources? And so tell me where. Okay. The statute does not directly define vessels as OCS sources. But I don't think that that means that vessels are spared from the obligation to apply best available control technology. And I think that that's clear for three reasons. And this all flows from the fact that the definition of OCS source says that emissions from support vessels, whether attached or operating within 25 miles, shall be considered direct emissions from the OCS source. For purposes of air quality standards? Well, they say for two different purposes. If you look at the language under 67A1, it says that OCS sources will be regulated for two purposes. In order to attain and maintain federal and state ambient air quality standards. I thought we agreed on one thing, that the service ships were not OCS sources under the statute specifically. You're saying if you interpret these other sections of the statute, you see that they are. But that sort of gives away the argument that the statute is somewhat ambiguous. Well, I think I actually have three points that I think make clear that Section 328's use of the phrase direct emissions is unambiguous. I can also address why EPA's interpretation here is unreasonable. But to begin with, I think it's important to look at the legislative history. The sponsors of Section 328 indicate... Well, can I just say that we wouldn't be going there if it weren't ambiguous. But in other words, if we can figure it out from the language, we wouldn't need the legislative history, right? Well, I think that the legislative history and other factors actually support a relatively natural reading of the term direct emissions. If emissions are emitted directly from a source, they are regulated fully under the PSD program, right? The emissions that come out of the tailpipe on Shell's drill ship are direct emissions and they're regulated consistent with that. Because it's an OCS source. Because it is an OCS source. But in Section 328, Congress included in the definition of OCS source the reference to vessels in order to ensure that they would be regulated as well. That's a policy argument and a policy interpretation of which you may be quite right. But isn't that the basis for saying the statute is somewhat ambiguous? Well, I think that the legislative history and the regulatory context also helps. One important... I guess I didn't get an answer yes or no on that. It may be a close call on whether this is ambiguous or not. But I think that this court's decisions in the Association of Irritated Residents and in other cases says that in determining ambiguity, you have to look not only at the words themselves, but also at context and also at structure. And further, legislative history is a traditional tool that can illuminate the meaning of the text. Okay, so could I just go to the statute instead of... Sure. Okay. So it's hard to know whether we should start with the BACT statute or the OCS section. But if you go to the BACT, it says the facility, it uses the word facility, correct? Correct. So that is subject to this best available technology. Right. So that's clear. Then if you go to OCS statute, which is 7627, there it says it talks about OCS sources. And as you said, they're supposed to attain and maintain. And in order to do that, it refers you back over to Part C. And Part C is where I would find the best available technology section, correct? Right. Part C is the PC. The OCS people have got to comply with Part C. Okay, that makes sense. Then you go to the next part of the statute, and it tells you what an OCS source is. It was used in the first part of the statute under A. And it could be equipment, activity, or facility, correct? Correct. Which emits potential air pollutants. And then it says there that any vessel that's servicing or associated with an OCS source within the 25 miles is considered as if the emissions came directly from the OCS source. Correct. So an OCS source can be equipment, activity, or facility, right? Right. Is the main ship a facility? I believe that in the first instance, the main ship is the facility. Once it's anchored. This is discovery. The discoverer drill ship, at the point where it anchors on the seabed, becomes a facility. And then the emissions associated with the support vessels are attributed to that facility. And I guess because when they write the Clean Air Act, of course, most of these things are not floating around. They're stationary things, coal fire plants and other things in the continental United States. So the discoverer is now anchored, so to speak, or fixed to the seabed. And it's a facility. I don't think the discoverer people or the EPA disagrees with that part. So as a facility, is the facility an OCS source? In other words, is the discoverer an OCS source? The discoverer, at the point where it anchors, is an OCS source. That is not in dispute. Okay. And all the emissions that come from there are considered direct emissions from that facility. Right. Anything that would be emitted directly from the discoverer is a direct emission. Okay. So then the statutory question we're left with then is, if you have a facility and its emissions include the, I don't know what you call them, related or ancillary vessels, how do we now fit that back into, in your view, the best available technology statute? Right. Well, all of the definitions under the PSD program pertain to facilities. And that's important because it means that EPA's interpretation here is unreasonable because it uses the word facility to say that best available control technology can't apply to vessels. But the very measures that it does apply to those service and support vessels, namely the requirement to demonstrate compliance with increments, for example, is also a statutory requirement that is reserved for facilities. And I think one really important component of legislative history, if you haven't had a chance to look at it, is set forth on page A64 of our addendum. And this is a statement of one of the sponsors of Section 328, which is explaining why the definition of OCS source was written the way that it has been. And the sponsor states that marine vessel emissions will be included as part of the OCS facility, the facility's emissions, for the purpose of regulation. And they add that this will ensure that the cruising emissions from marine vessels are controlled as if they were part of the OCS facility's emissions. Mr. O'Brien, you can conceive of two levels of administration and regulation, one being attributing the service ship's emissions to the discoverer for purposes of air quality control, and the other separately regulating the discoverer and then the other facility, which is an OCS source, as to BACT standards. You're not saying that it is not conceivable that there would be two levels of control on discoverer and one level of control on the service ships? I don't concede that because I don't think that's what the statute contemplates, and there are statutory obstacles to EPA's approach in that respect. First of all, there is... You could have said it very easily. You could have said, and the service ships not only have their emissions attributable to OCS, I mean to the discoverer, but are considered as separate OCS sources. Well, as we explain in our brief, there's an important regulatory reason why that setup won't work. Why? And I'd like to highlight that for you. Under the PSD program, sources are only subject to the full requirements if the source emits more than 250 tons per year. So only truly large sources get regulated under the PSD program. However, the legislative history reflects that Congress wasn't concerned just with the drill ship. It was concerned with the totality of the emissions from the drill ship and the vessels working together. And if you separated the vessels and tried to regulate them individually, it's possible that none of them would cross the 250-ton threshold and trigger the requirements of best available control technology or any of the other PSD requirements. That's a pretty good argument for not calling them OCS sources and requiring BACT approval. Right. In fact... But do they say if the PSD doesn't apply, and do they use the word if the source is less than 250? The key term here is potential to emit, and I think that that's pivotal because EPA includes the support vessel emissions in the potential to emit. Under the PSD program, the facility's potential to emit is the whole ball of wax. If it's larger than 250 tons per year, that's what triggers the entire suite of PSD requirements, not just best available control technology, but the requirement to indicate compliance with increments and other standards. And you're saying you can't split these things out. Right. I absolutely don't think that you can split them out. I mean, the PSD program, each and every one of its requirements, is a requirement levied on the facility itself. And here, EPA has taken the position that the facility includes these emissions for purposes of determining the potential to emit. It concedes that the facility includes the support vessel emissions for purposes of demonstrating compliance with increments, which is different than compliance with ambient standards. Increments are only a creature of PSD, and they only apply to facilities. And so two of the three major requirements, EPA says the facility and the support vessels are part and parcel. It's only when it gets to the best available control technology requirement that it says vessels should be treated differently. And to the extent that the word facility appears in all of these PSD requirements, it doesn't make sense to isolate BACT as not applying to the support vessels. So if I'm looking at the general clean air statute, 74, 75. Yes. And then it has these eight things that happen under the statute. Correct. You're saying that under number three, which talks about if you have air pollution in excess of certain things, then on that point they include the collateral vessels. Yes.  So on number three they do, but on number four they don't. Right. They apply 74, 75, A3 to include the vessels as part of the facility. But when they get to A4, they determine that all of a sudden the word facility means that vessels can't be regulated for that purpose. And that, we think, is contrary to the statute, contrary to the greater purpose of the PSD program, and also an arbitrary distinction. Did you want to say anything? I do, unless you have anything pressing. I think not. Thanks. We confused you by having two podiums. I almost stood up there. Good afternoon. My name is Daniel Pinkston. I'm an attorney with the Environmental Defense Section of the Justice Department in Denver. And with me here today is Ms. Julie Vergeront, who is Assistant Regional Counsel out of Region 10. We also have here today counsel for Shell, intervenors in the case, and we've determined that I will take 12 minutes of our time and Shell will take the remainder. All right. So this case involved a very rigorous procedure, very robust procedure involving public comment and two iterations of the two permits at issue. Ultimately, these permits went to EPA's Environmental Appeals Board, which is set up to regulation. The Environmental Appeals Board rendered two basic decisions in the case. In the first, it determined that EPA's interpretation of whether or not BACT, which is the usual way it's said, BACT applies to the associated fleet, was properly determined in these permits by EPA. In other words, that BACT did not apply to the associated fleet, based on a very long and, we submit, well-reasoned analysis. In a separate decision, the EAB stated that EPA's interpretation of its regulation regarding where the boundary for ambient air exists was also permissible interpretation of its own regulations. We submit that the EAB decision is where the agency speaks in this matter. The EAB, on some other issues in the first permit, sent it back to EPA for further analysis, based on some legal interpretations made by the EAB. So what we're looking at here is the EAB speaking for the agency, and as we've submitted in our briefs, the EAB analysis is entitled to deference under the Chevron standard. That's important because what we have here in Section 328 is an ambiguous statute. The petitioners have alleged that it's not ambiguous, but as the EAB found, it's really not very clear exactly what it means. EPA has applied a regulation interpreting Section 328 that it promulgated 20 years ago next week, as a matter of fact. And what was done in this permit is a pretty straightforward application of that regulatory determination of whether or not or how you count air emissions from the associated fleet when you're looking at the OCS source. We would state that there's no dispute that the discoverer itself is an OCS source. It's tied to the sea bottom, and that's really what makes it a stationary source. As we indicated in our briefs, the Clean Air Act has this very basic distinction between stationary sources and mobile sources. May I interrupt you, Mr. Pinkson, for just a second, see if I can get a clear idea of this. Is it your position that the EAB determination is an interpretation of an EPA regulation or an interpretation of the EPA statute? Well, the EAB found that the Section 328 provisions regarding OCS sources as it relates to the associated fleet was ambiguous. There was no way to tell, just from the language of the statute, how Congress intended necessarily for the emissions from the associated fleet to be attributed to the OCS source, which is the stationary source. EPA then, very reasonably, in trying to issue the regulations which Congress directed EPA to issue, said, well, this language about direct emissions, it's really not very clear exactly what that means. Unlike what petitioners would say, direct emissions doesn't have a completely accepted meaning in the world of this prevention of significant deterioration regulation or mobile sources. So EPA was faced with trying to determine, well, what's a reasonable interpretation of this requirement? And what they came up with is that the potential to emit pollutants of the associated fleet will be attributed to the OCS source, and that has a couple of consequences. One is that if you take the emissions from the associated fleet and say, okay, we'll consider those as if they were from the OCS source. Number one, it goes towards whether or not the OCS source meets the 250 tons per year limit that would make it a major stationary source and thus subject to the PSD regulations. But it also goes towards the requirement that the OCS source not violate the National Ambient Air Quality Standards, which are the health-based standards for how much pollution there can be in the air, and also whether or not the OCS source is violating what's called the increment. In other words, are they polluting too much to dirty up already clean air too much? So there is a consequence, and EPA determined that there is a way that does no violence to the statutory scheme that is in accord with the basic Clean Air Act distinction between stationary sources and mobile sources. And that's what they came up with back in 1992. Now let's go to the statute. Yes. Because that sort of skirts the statute, it seems to me. So I'll just go back to the same questions really that I asked Mr. O'Brien. I mean, it seems not very consequential to say that the Discoverer is a facility under 7627C, correct? It's clear that the Discoverer is an OCS source under the statute. Okay. So it's an OCS source, and if you have an OCS source, an OCS source is not just anything. It's either equipment, an activity, or a facility. Okay. Right? That's correct. Okay. So the Discoverer is a facility, or do you not want to say that? It is a facility in the sense that it emits air pollutants. Is it a facility, yes or no, under the statute? The actual ship itself would be a facility. Okay. And as a facility, because a facility is one of the words used, it is also an OCS source, correct? It's an OCS source for a number of different reasons, not simply because it's a facility. I think the statute also talks about activities as well. Correct. But it's an OCS source because it is located on the Outer Continental Shelf. It does emit pollutants, but most importantly, it's tied to the bottom of the ocean. That's what makes it a stationary source. Because when you look at the statutory definition in Section 328, which is 7627, one of the requirements is that, if you'll see, that the source, to be an OCS source, it must be regulated or authorized under the Outer Continental Shelf Lands Act, which is 43 U.S.C. 1331. And that's all about what authorizes the United States, and under that statute it was DOI, but what authorizes the United States to regulate these activities on the Outer Continental Shelf. So the OCS source, the essence of it, is that it's tied to the bottom of the ocean. And here, the drill ship is anchored with, I don't recall if it's six, but it's a number of anchors so that it stays in one place. That's why it's an OCS source. Well, that's not really what the statute says. See, that's the difficulty. The statute says it's an OCS source, which, if it emits, if it's regulated or authorized, and it's located on the OCS. Okay, so we know that a facility is an OCS source, correct? But only a facility that is tied in one place to the Outer Continental Shelf. That's why it's a stationary source, which is sort of what makes PSD apply. So instead of skirting the question, answer again. Is the Discover a facility, yes or no? It is a facility. Okay, is it an OCS source? The Discover is an OCS source, yes. Now you go to the second part of the statute, and it says, for purposes of this subsection, emissions from any vessel servicing are associated with an OCS source within 25 miles shall be considered direct emissions from the OCS source. But if I could point to the language here, it says emissions from these vessels, the associated fleet, will be considered direct emissions from the OCS source, and that's exactly what the regulation does. It says we will count the emissions from the associated fleet in determining, we're going to add them into the emissions from the OCS source, the drill ship. And from that, we're going to decide whether or not the drill ship plus the associated fleet emissions either violates the NACs or violates the increment. Right. BACT is not required in that circumstance. Well, it then says in Part A that this all applies to Part C, and Part C is where you find the BACT and your various other emissions requirements, correct? But note that... Yes or no? I'm sorry. I was focusing on, I apologize. You made me down the road. I'm trying to stick with the statutes. I'm trying to understand your interpretation of it. So if you go from the Outer Continental Shelf Statute, it tells you that Outer Continental Shelf sources, which we've just determined includes this discovery. Right. That it's governed by Part C, and Part C includes BACT as well as maximum emissions and other things, correct? That's correct. Okay. So what is the basis for distinguishing the application of the BACT under Subsection 4 to this facility and Subsection 3? Well, the difference is that the Section 328.76.27, the OCS statute, says that OCS sources are subject to PSD, which would include the BACT requirement. There's no dispute that BACT applies to the Discoverer drill ship. There's no dispute about that. But the vessels, the associated fleet, are mobile sources, not stationary sources. Can I just stop you there so I can understand? The stationary versus mobile distinction I don't see in the statute. So where do you get that, and where does it go in the statute? Your Honor, before I answer your question, I know I'm down to seven minutes. That's fine. We have time for it. We don't have time. Thank you. You know, it's a complicated statute, so we want to understand the statute more than we want to stick to the time. Exactly, Your Honor. Well, when you look at the EPA regulation, the preambles to the regulation, there's a discussion there of how the drill ship is an OCS source. It's a stationary source. Therefore, that's one of the reasons that PSD is applicable. It's because it's a stationary source. There's Title I of the Act, which says prevention of significant deterioration, and that deals with major stationary sources. Then you have Title II of the Act, which relates to mobile sources. And under the Clean Air Act, for example, under Section – let's see if I got this right here. Under the definition – Part C, which includes BACT, what does it say in the statute that that only relates to stationary sources? I believe it's in Section 165 of the Clean Air Act, which is 7475, where it talks about what are subject to PSD requirements are major stationary sources. I'm trying to find the pinpoint there. I'm not seeing it, so I'm trying to help find that. Let's see. The 7475 talks about major emitting facilities. And then if you look at Section 169, which is the definitions for PSD, that's 7479, it defines the term major emitting facility means any of the following stationary sources of air pollution. So it is tied into stationary sources in the statute. Also, the statute I was fumbling for is Section 7602, which is definitions, and 7602Z, which says that vessels – in essence, it says that vessels, and that's what they call the ships of the associated fleet – are not within the definition of stationary source. So the OCS source is a stationary source. The vessels are mobile sources. And when you look at the PSD statute – I'm sorry. And the way you get there, to make sure I understand it, is really by going to the definition of major emitting facility. I think that's correct, Your Honor. Okay. I mean, I should say that it's not a disputed question as to whether or not the PSD applies to stationary sources as a general matter. I mean, that's the underlying structure of the Act when it comes to PSD and mobile sources. Okay. Thank you. Thank you. So could you just start the clock over? Because I believe that Ms. Sullivan was going to have seven minutes. Is that right? Eight, Your Honor. Eight. Ten. Give her ten since we've taken a lot from there and we'll give Red Oil some additional time as well. Good afternoon, and may it please the Court. Kathleen Sullivan for the Shell Interveners. I'd like to begin by showing that Judge Bea dispatched the petitioner's initial argument that the statute unambiguously applies back to requirements to vessels that are not tied up to the discoverer. Because, as Judge Bea pointed out earlier, if Congress had wanted to apply all aspects of the PSD program to the associated vessels that are not tied up, it simply would have defined OCS source as including associated vessels. It did not. If Congress had said an associated vessel is an OCS source or is part of an OCS source, then the statute would have been unambiguous, but it doesn't do that. To the contrary, the Rosetta Stone of the case, so to speak, the direct omissions clause. And, Judge McKeon, the easiest place to find that is in A28 of the blue brief, the appendix to the blue brief, A28. The clause that Mr. O'Brien emphasized, the direct omissions clause, precisely does not define vessels that are servicing or associated with an OCS source either as an OCS source or as part of an OCS source. It doesn't do that. You're saying that it really just sets the bar for how they're measured as to whether they're going to fall in or out of certain regulations. Well, let's back up for a second and ask what the question really is. The question is not does the statute unambiguously define associated vessels as an OCS source or part of an OCS source. It clearly does not do so. The question is whether EPA reasonably interpreted the PSD requirements and let's think of those as having three parts, NAAQS, the National Ambient Air Quality Standards. The second part is the increment. Those are the more stringent standards within the region. And those two, as Judge Bea called them before collectively, are the air quality standards. So they're the air quality standards, the NAAQS and the increments. And then there's this other thing called the BACT. And the BACT is about what technologies you apply to the source or the facility. Now, Judge McKeown, you said to Mr. O'Brien, is it unreasonable for EPA to apply one level but not the other to the associated vessels? And the answer is, is EAB correctly determined? It's absolutely reasonable for the agency to apply the air quality standards to the associated vessels within 25 miles when they're not tied up to the discoverer but not to apply BACT to those vessels. And let me go through the textual reasons, the structural reasons, the policy reasons. Boom, boom, boom. It's like a treasure map. If we start with the textual reasons, and, Judge McKeown, if I could just do the textual argument in four quick steps, and then I want to answer Judge Bea's question about whether this is an as-applied or a facial challenge. To do the textual argument, you start with 328A1, which says we are— What's the section number for that? I'm sorry, 328A1 is 42 U.S.C. 7627A1. It's in the blue brief addendum at page A26. Judge McKeown referenced it earlier. We tend to use the 7627 because that's what's in this rather than the legislating. Understood. So if we start with 7627A1, this gives the EPA this new jurisdiction. We have offshore drilling. We have Santa Barbara. This new jurisdiction comes to the EPA in 1990 over OCS sources. And this jurisdiction applies to OCS source. OCS sources, when we look at 7627A1, how do we know what an OCS source is? Well, 7627A4C, that's blue brief addendum page A28, it gives us a definition. It says an OCS source, sorry, an Outer Continental Shelf source, is an equipment activity or facility which emits or has the potential to emit any air pollutant and is regulated or authorized under the Outer Continental Shelf Lands Act. All right. Next clue in the treasure hunt is let's go to Oxla. Let's go to Oxla. He referenced that and what it's called. He did. Defined term there says attached to the seabed. So the Clean Air Act points us by the definition of OCS source to Oxla, which defines an Outer Continental Shelf source as something attached to the seabed. And that, Your Honors, is 43 U.S.C. 1333A1. 43 U.S.C. 1333A1. Easy place to find it is shell brief at page 31. Now, attached to the seabed is crucial here. So what happens next? Well, the agency says, okay, we've got to exercise our jurisdiction and make a rule. And here, Judge Bea, the answer to your question, what was the AB interpreting, is it's interpreting the statute and the rule. And the rule cannot be challenged facially here. It's interpreting the statute and the rule. Let's go through it. What happens in early 1990s after EPA gets this new jurisdiction over air pollution on the OCS, it passes, it enacts, promulgates and enacts 40 CFR 55.2. 40 CFR 55.2. That's in the blue brief addendum at page A44. And EPA, the agency, in its regulation through notice and comment rulemaking, defines OCS source as including, as Judge Hawkins said before, it obviously includes the discoverer. That's an OCS source because it's attached to the seabed once it docks and anchors and attaches to the seabed floor. But the agency said, well, we are also going to include within the definition of OCS source those mobile vessels when they tie up to the discoverer as long as they are tied up. They become a kind of temporary OCS source. But what the regulation does not do is what Mr. O'Brien is trying through his strained interpretation to say it does. What it does not do, this regulation does not define as an OCS source an icebreaker, a supply ship, or another vessel that moves around the discoverer within 25 miles of it but does not ever tie up. Now, the question is not whether there could have been a different interpretation. The question is not whether Congress maybe should have had a more stringent policy. The question is, is the EPA within its reasonable discretion in reading that regulation to permit it to apply NACs and increments to the mobile vessels but not to apply BACs to the mobile vessels? And we think it absolutely is within its discretion. Judge Bea, the reason why I said that you can't have a facial challenge to that regulation anymore is it's too late. I would have had to go through that, the notice and comment time. Six months later, 60 days or six years, we're long past that. And by the way, Your Honors, the D.C. Circuit in the Santa Barbara County Air Pollution Control Case 1994 upheld the regulation 40 CFR 55.2 against arbitrary and capricious challenge. So I think Mr. O'Brien is trying too late to in effect challenge the facial validity of the regulation. The real question before you now is did the agency, and we see the agency action here as the issuance of the air permit after notice and comment decision-making and robust administrative review. My colleague from the government has ably described to you how formal and exhaustive and meticulous the administrative review here was, 150 pages of opinions, 27 pages of which are devoted to the two issues before you today. So that long prelude is the text answer. EPA was reasonably interpreting a text which defines OCS source as a thing attached to the seabed. And it adds anything that might be temporarily attached to the thing that's attached to the seabed. Now, Judge McEwen, you say, where does the PSD statute come in? And of course 7627A1, you're right, it does refer to the PSD statute. But my colleague from the government has already showed you that the PSD statute defines a major emitting facility 42 U.S.C. 7475A4 as a stationary source, 42 U.S.C. 7479A1. So if you go over to the PSD statute, you're still going to get facility, stationary source, it all lines up. But you might say what facility was something attached? Facility was something attached. That's exactly right. Now let's go to the structure, Your Honor. As my able colleague from the government reminded you, where are we here? We're in Title I of the Clean Air Act. The big difference between Title I and Title II, Title I is about such things as we're talking about here, the construction of new facilities. Those are stationary sources. Title II is where we do mobile emissions. Just like on land, Title I would apply to factories and refineries. Title II would apply to cars and trucks. So the stationary mobile distinction is operating here in just the same way. EPA is saying, well, we're not going to take over the whole regulation of the caterpillar engines on the back of the supply vessels. That's over in Title II. Or for a foreign flag vessel, it's regulated by treaty. So the structure, the distinction between Title I and Title II, PSD is in Title I. It's about facilities. It's about the ocean-bound equivalent of the factory or the refinery. That's the structural argument. And last, let me get to the policy argument. Because you might say, gee, isn't it odd to regulate the mobile vessels that are not tied up for nacks and increments? And he points to various statements in the congressional history that might suggest they didn't want to make sure that these things were just sort of out to sea, so to speak, and not counted. Well, Your Honor, the precise answer to that is that they are counted. And they're counted in a very significant way. And let's go back over this because it's very important. The agency counts the emissions from the mobile vessels to determine two things. Number one, are we in PSD land? Are we a major stationary source emitting over 250 tons? That's so significant we wouldn't be here without it. We're only here today. DISCO by itself, DISCOVER, doesn't emit enough. Because it doesn't emit enough. It doesn't aggregate under the statute. That's right. That's exactly right. And so what EPA has done here is very much count mobile vessel emissions under the Clean Air Act. It's just counting them for purpose of imposing the PSD requirements on the DISCOVER itself and saying, now, you don't get away with your less than 250 tons of emissions because you're being serviced by icebreakers and supply ships. We're going to count their emissions as part of the total emissions of the project. And we're going to trip you up into the world of PSD requirements, nacks and increments. Increments being more stringent. So the entire reason we're here, this is a very significant consequence of counting the mobile vessel emissions. The way I put it to you, Judge McKeown, is just EPA is counting the emissions from the mobile vessels. It is regulating the emissions of the mobile vessels. It is just not regulating them as OCS sources. It's regulating them as emissions attributable to the OCS source and maintaining its regulatory authority only over the OCS source. The second consequence, of course... That just goes back to the statute. I take it that while the collateral vessels under the statute are considered for purposes of emissions, that the definition of OCS source never changes. That's exactly right, Your Honor. And if you look at the key language on M7627A4C, 7627A4C, the last clause, the direct emissions clause, it's in the blue brief addendum A28. Mr. O'Brien is not making a plausible reading of that text. That text distinguishes between an OCS source and the vehicles associated or servicing the OCS source. You can't be an OCS source if you're a vehicle associated with and servicing the OCS source. The very language he cites to make the vessels equivalent to the discoverer itself distinguishes the two. And what's before you today is whether the agency made a reasonable determination that the vessels' emissions would be attributable to the discoverer for NACs and increment purposes, but not for BACT purposes. We think that's eminently reasonable whether you apply Chevron deference, which we think would be appropriate here, given the formality and fairness and deliberation of the rulemaking under Mead, or it would satisfy Skidmore deference, if you think there's any doubt that Chevron applies, because this is a case in which the agency acted with great formality within an area of its regulatory expertise and in which it acted in a way that involved notice and comment as well as robust administrative review. Thank you. Mr. O'Brien didn't mention the virtual fence at sea. We have good briefing, I think, from both sides on that point. Thank you, Your Honor. Thank you. We're going to give you five minutes. First, I would like to begin by correcting what I think is a misstatement on the part of the respondents, who have suggested that the support vessels, to the extent that they have had to show compliance with increments and install control measures to ensure that compliance, are not being regulated as OCS sources. That is not accurate. The requirement to demonstrate compliance with increments is unique under the PSD program to major emitting facilities and which the respondents would make equivalent to the OCS source. So that highlights the tension in respondents' position. They say there's no reason to apply the best available control technology because these aren't OCS sources. But then they turn around and tout the very regulations and requirements that have been imposed upon the vessels, which originate under Part C of Title I and are unique to stationary sources. So stationary source requirements are being applied to the vessels, and EPA hasn't supplied any reason why the vessels should be required to demonstrate compliance with increments, but not with best available control technology because those are both PSD requirements. Refresh my recollection as to what increment regulation contains. What does increment mean? Under Section 163 of the Clean Air Act, which I believe is 7673, an increment is a lesser quantity of pollution that's allowed over a baseline. So you have to achieve the National Ambient Air Quality Standards, and then regardless of what the air quality is in your area, the increment says in that particular area, you can only increase by a small amount. And so that requirement, the increments, originates in Section 163 of the Act, and the requirement to demonstrate compliance with increments is Section 165A3 of the Act, and those are both PSD requirements specific to major emitting facilities under Part C. And EPA has offered no explanation why some PSD requirements should be applied to the vessels but not others. Now, I suppose to the extent that they have offered an explanation. Let me just go back. Are the icebreakers and these others major emitting facilities by definition? No. The only reason that they're regulated is because EPA has included them in the potential to emit, and like I explained before, the potential emit triggers the obligation to install back. It also triggers the obligation to demonstrate compliance with increments. EPA selectively here has applied one and not the other. To the extent that respondents have given a reason for not regulating the vessels, they say that's because the Act generally distinguishes between mobile sources and stationary sources. And I don't think that that argument carries any water here, because EPA itself in its own action and acknowledgments has indicated that it's a new and unique regime for the Outer Continental Shelf source. For example, if I could point your attention to the further excerpts of record at pages 10 and 11, the EPA acknowledges that if you were just to apply stationary source requirements, as they're currently written, to the drill ship, that means 29 of the 32 emissions units would not be regulated. Accordingly, what EPA said then is that Section 302Z, the very provision that counsel for EPA cited as meaning that vessels couldn't be regulated, EPA says from page 10 to 11 of the further excerpts of record that Section 302Z of the Clean Air Act is overridden by the more specific definition of OCS source in Section 328 of the Act. And then they further cite legislative history indicating that Section 328 is intended to supersede any inconsistent authorities. So to the extent that the mobile stationary division that exists on onshore might limit regulations in the OCS, EPA has indicated that those constraints don't apply to the drill ship, and it hasn't explained any reason why the regime shouldn't be recognized as new and different for the support vessels as well. Finally, I want to make an important point about EPA's regulation on the definition of OCS source. I think it's important to point out that in Volume 3 of the administrative record at page 483, EPA concedes that neither the preamble to its OCS regulation or its regulation itself specifically describes the extent to which best available control technology may or may not be applied to support vessels. So EPA concedes that the regulation and the preamble fail to answer the question here. I'd also like to highlight that EPA specifically concedes a point that they made before the Environmental Appeals Board, a point that Counselor Sullivan seems to want to resurrect before this court. But EPA waived its claim that we were bringing an impermissible facial challenge to the regulation. Ultimately, I think it's important to bear in mind that what we're construing here is the statute, the regulations are essentially unclear, and the preamble statements are equally unavailing. And so neither the preamble statements nor the regulation itself can dictate the interpretation of the statute. It is the statute that has to govern, and to the extent that the potential to emit under EPA's regulations says that the support vessels are part and parcel with the facility, we believe that means that the control requirements applied to those vessels must reflect the same degree of control, whether it's demonstrating compliance under national ambient air quality standards, whether it's applying the Part C requirement to demonstrate increments, or whether it's the best available control technology. Even if you don't think that the direct emissions language of Section 328 is clear, one thing is clear. EPA has interpreted the provision arbitrarily because it has distinguished between vessels, regulating them for some PSD purposes but not others, and none of the arguments that it has made to substantiate that distinction are legitimate under the statute. One last question dealing with timing. Here we are on August 28th. Is this permit essentially moot for the 2012 drilling season? I don't think so because the discoverer has not begun drilling yet. Also, it's important to emphasize that this permit exists in perpetuity. It will never expire. And so a speedy decision would be welcomed, but also there is the reality that the drilling season may commence soon, although it has not at this point. Thank you very much. Thank you. I would like to thank all counsel for your arguments. I know not everything is clear, but I have to say that all of you did make your positions very clear, and I appreciate it. It was very nicely argued. The briefs are well briefed and very extensive. With that, we will submit now the case of red oil versus EPA and Shell, and the court is adjourned for this morning. Thank you.
judges: Hawkins, McKeown, Bea